NATHAN W. KELLUM
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38117
(901) 684-5485 – Telephone
(901) 684-5499 – Fax
nkellum@crelaw.org
Attorneys for Plaintiffs David Grisham and Tina Watson

ANNE R. HELZER
Anne Helzer, Attorney at Law
310 K Street
Anchorage, AK 99501
(907) 264-6647 – Telephone
(907) 264-6602 – Fax
annehelzer@helzerlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| DAVID GRISHAM and TINA WATSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:18-cv-1 |
| | ) | |
| MUNICIPALITY OF ANCHORAGE, ALASKA, JOHN RODDA, in his official capacity as Anchorage Parks and Recreation Director, and JOHN CASSELMAN, individually and in his official capacity as police officer for the Whittier Police Department, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### VERIFIED COMPLAINT (42 U.S.C. §1983)

Comes now Plaintiffs David Grisham and Tina Watson, by counsel, and aver the following:

### INTRODUCTION

1.      This is a civil rights claim brought under 42 U.S.C. § 1983, challenging Municipality of Anchorage policy and practice that empowers and enables Girdwood Forest Fair, Inc., a private entity, to ban religious expression from California Creek Park, a public park in Girdwood Valley service area, during the Girdwood Forest Fair, an annual event that is free and

open to the public.

2.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs David Grisham and Tina Watson seek injunctive relief, declaratory relief, and nominal damages against the Municipality of Anchorage, Alaska, John Rodda, in his official capacity as Anchorage Parks and Recreation Director, and John Casselman, individually and in his official capacity as police officer for the Whittier Police Department.

3.    This action is premised on the First and Fourteenth Amendments to the United States Constitution regarding Plaintiffs' right to free speech and right to due process.

4.    Defendants' actions have deprived and persist in depriving Plaintiffs of their constitutional rights.

5.    Each and every act of Defendants, as alleged herein, was committed by named Defendants under the color of state law and authority.

## JURISDICTION AND VENUE

6.    This action relates to federal questions arising under the First and Fourteenth Amendments to the United States Constitution and federal statue, 42 U.S.C. § 1983.

7.    This Court has original jurisdiction over Plaintiffs' claims for injunctive relief and nominal damages via 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over Plaintiffs' request for declaratory relief via 28 U.S.C. §§ 2201 and 2202.  This Court has jurisdiction over Plaintiffs' request for costs and attorney fees under 42 U.S.C. § 1988.

8.    The proper venue is the District of Alaska under 28 U.S.C. § 1391(b).  All of the Defendants reside in this district and actions giving rise to the claims occurred in this district.

## PLAINTIFFS

2

*Grisham v. City of Anchorage, et al.*

9.      Plaintiff David Grisham ("Grisham") is a resident of Anchorage, Alaska.

10.     Plaintiff Tina Watson ("Watson") is a resident of Fort Worth, Texas.

## DEFENDANTS

11.     Defendant Municipality of Anchorage, Alaska ("Anchorage") is a municipal governmental authority in the State of Alaska.  Anchorage owns, controls and is responsible for regulation of public parks and ways in the Girdwood Valley service area.

12.     Defendant John Rodda ("Rodda") is Anchorage Parks and Recreation Director. In his official capacity, Rodda is responsible for managing and regulating public parks with the control of Anchorage, including public parks located in the Girdwood Valley service area.

13.     Defendant John Casselman ("Officer Casselman") is a police officer with the Whittier Police Department. In his official capacity, Officer Casselman is charged with enforcing laws, regulations, and policies of California Creek Park during the Girdwood Forest Fair, as part of police servicing agreement between Anchorage and the Whittier Police Department.  Officer Casselman is sued in his official and individual capacities.

## STATEMENT OF FACTS

### Grisham's and Watson's Religious Expression

14.     Grisham is an evangelical Christian burdened to share his faith with others in public.

15.     Watson is Grisham's step daughter.  She is also a Christian.  And because of her faith, she is similarly convicted to share the Gospel of Jesus Christ with others in public.

16.     Specifically, Grisham and Watson want people to know that all have sinned and fall short of the glory of God, and deserve condemnation, but Jesus died on the cross for them,

extending salvation to those who accept and believe in Him. Grisham and Watson believe all people can be saved by trusting in Jesus. They yearn for this to happen and are burdened to let people know about this offer of salvation.

17. Grisham and Watson seek out opportunities to share the gospel (good news) message wherever people are found. They often go to public events, either alone or together, and hand out religious literature known as gospel tracts to share their message. When given the chance, they also engage people in friendly conversation about their faith.

18. Grisham and Watson consider literature distribution indispensable for communicating their message in public places. They can convey their entire message by handing someone a piece of paper.

19. They also consider conversation another important aspect of their message because it facilitates questions and opportunities to address any concerns someone might have about their faith or message.

20. Grisham and Watson occasionally preach in public, that is, they orally proclaim their views. And they have used signs at times. But they much prefer to hand out tracts and engage people in conversation because they have found, through experience, that those means are the most effective ways for getting their message across.

21. When Grisham and Watson share their beliefs in public, they are careful to not obstruct passageways. They take necessary steps to assure that they do not hinder pedestrian traffic or create congestion.

4
*Grisham v. City of Anchorage, et al.*

22.     Neither do Grisham nor Watson force their literature on anyone. They do not approach people in an aggressive manner.   Both Grisham and Watson strive to be non-confrontational in their expression, in an attempt to be winsome.

23.     Grisham and Watson only give literature to those who want to receive it.  And they only converse with those who want to have a conversation.

24.     In sharing their faith, Grisham and Watson do not solicit money or membership to any group.  They do not ask for signatures.

25.     Grisham and Watson want to share their religious beliefs in California Creek Park in the Girdwood Valley service area of the Municipality of Anchorage during the annual Girdwood Forest Fair due to the large number of people who regularly attend this public event.

### *California Creek Park*

26.     California Creek Park is a public park in the Girdwood Valley service area, located at Mile 2.2 on the Alyeska Highway.  It is bordered by Alyeska Highway to the north, Egloff Drive to the east, and California Creek to the west.

27.     Situated in the Municipality of Anchorage, California Creek Park is the property of the Municipality of Anchorage.   It is managed by Anchorage Parks and Recreation Department, and more specifically, by Girdwood Parks and Recreation, a subdivision of Anchorage Parks and Recreation.

28.     The park has a community children's playground with a play house, slides, swings and other play structures, a tennis court, a skate park with rails and ramps, a large number of paved sidewalks and walking trails, numerous picnic areas, several pavilions and stages, a volleyball court, a ball field, and a set-up for mountain disc golf course, among other amenities.

29.     As a public park, the site remains open to the public for general use, including picnicking and recreational use, at all times when the park is open.  No scheduling, registration, or fees are required for such use.

30.     California Creek Park is not bounded by any gates or fencing.  Individuals can enter the park through enumerable pathways, virtually any path that goes through trees and shrubbery.

31.     Some of the openings into the park have timber bollards in front of them, but they are intended to block vehicles only.  The park allows for free pedestrian access at all times. There are no signs or other markers indicating that public use is restricted.

32.     As a public park, California Creek Park is uniquely well-suited for expression and the free exchange of ideas.

### *Girdwood Forest Fair*

33.     On a yearly basis, ever since 1975, California Creek Park has hosted the Girdwood Forest Fair, an event run by Girdwood Forest Fair, Inc. (also referred to as "organizer"), a private, nonprofit organization.

34.     Girdwood Forest Fair is a three-day festival occurring in early July, featuring Alaskan artists, hand-crafted items, exotic (as well typical) festival foods, and musicians and entertainers from all over Alaska.

35.     The Girdwood Forest Fair offers a wide array of vendors and exhibits.  It also has a beer garden.  Activities for the event include acoustic, rock, jazz, rap, Irish, country and folk music, belly dancing, hula hoop dancing, fire throwing, craft tables, various contests for kids, and face paintings.

36.     The Girdwood Forest Fair is free and open to the public at all times.  There is no charge for admission to the Forest Fair, no ticket is required, no invitation is needed, and there are no barriers limiting pedestrian access.  The event is open to the public at large.  As the organizer states in its promotional materials:  "There is no admission fee, only good times."

37.     The organizer has historically maintained a festival rule of "No Dogs, No Politics, No Religious Orders."  This rule was in place during the 2017 event.  It was publicized on the website ([www.girdwoodforestfair.com](www.girdwoodforestfair.com)) and on signage placed outside of the event.

38.     To put on the Girdwood Forest Fair, the organizer must secure a special event permit each year from the Municipality of Anchorage and Anchorage Parks and Recreation to use California Creek Park for this purpose.  A special event permit is required for any public event involving 50 or more people.

39.     Fees for a special event, including the Girdwood Forest Fair, are based on anticipated number of attendees, concessions, and alcohol sales.

40.     This permit for having the Girdwood Forest Fair in California Creek Park is reflected in the yearly permit contract entered into between Girdwood Forest Fair, Inc. and Anchorage Parks and Recreation.

41.     The permit contract for the 2017 Girdwood Forest Fair specifies that the event is open to the public.  The permit contract further sets out guidelines for park use stating the park will remain open to the public during the event.

42.     Also, pursuant to the 2017 permit, a security plan was required.  This security plan entailed Municipality of Anchorage providing general law enforcement services for the Girdwood Forest Fair during the course of the event.

43.     For the 2017 Girdwood Forest Fair, Anchorage, on behalf of Girdwood Valley service area, entered into a contract with Whittier, Alaska to supply four sworn police officers from the Whittier police department for police services during the event.

### *Squelching of Grisham's and Watson's Religious Speech at Girdwood Forest Fair*

44.     On Saturday, July 8, 2017, Grisham, along with his grandson Airric, and Watson, drove from Anchorage to California Creek Park to share their Christian faith with others in park during the 2017 Girdwood Forest Fair.  Watson was in Anchorage, visiting Grisham.  Having heard about the Girdwood Forest Fair, they decided to visit the event before Watson flew back to her home in Texas.

45.     Grisham and Watson arrived at Girdwood Valley service area around noon that day.  They intended to convey their beliefs through gospel tracts and conversation.  They did not carry any signs with them and they did not plan to preach.

46.     Grisham and Watson chose this specific date and location because they knew Girdwood Forest Fair was taking place then and there, promising a significant audience for their Christian message.

47.     After arriving to the area, they drove to the designated parking space for the Girdwood Forest Fair, the Alyeska Resort parking lot.

48.     As they drove toward the parking lot, Grisham and Watson noticed a few signs for the Girdwood Forest Fair stating:  "No dogs, No politics, No religious orders."

49.     Neither Grisham nor Watson was familiar with the phrase "religious orders" and neither believed the prohibition applied to them.  They do not consider themselves as part of any religious order.  They did not believe the park would preclude all Christians or censor Christian

*Grisham v. City of Anchorage, et al.*

speech. Grisham, having seen another Forest Fair sign stating "Caution: hippies ahead,' presumed the remark on the signs was made tongue-in-cheek.

50. Grisham, Watson, and Airric caught a shuttle bus at the Alyeska Resort parking lot. As they rode on the bus, they went down Alyeska Highway, turned off on Egloff Drive and then turned into a gravel area in front of Glacier City Hall and up to a circular driveway which went around an island of trees. The driveway served as shuttle bus drop-off and pick-up zone for event attendees.

51. Exiting the shuttle bus, they saw a permanent sign in the ground and attached to a pole stating that the park is the property of the Municipality of Anchorage.

52. They also saw a big wooden sign signifying the Girdwood Forest Fair event, and behind the sign, a brown house to the left and a children's playground to their right.

53. They entered the event by walking on a path flowing between the brown house, tennis courts and a skate park to their left and the children's playground to their right, following others who were traversing this same path.

54. As anticipated, the Girdwood Forest Fair was free of charge and open to the public, without need of a ticket or invitation to get in. There were no barriers preventing or inhibiting pedestrian access. No one associated with the Girdwood Forest Fair or park was checking for identification.

55. There was no fencing or anything else signifying boundaries for the event. While many who exited the shuttle bus took the same path as Grisham and Watson to enter the Forest Fair, visitors were free to go in the event area from any direction.

*Grisham v. City of Anchorage, et al.*

56.     Walking past the playground and skate park, Grisham and Watson began to notice rows of vendors in pop-up tents that were lined up alongside various asphalt sidewalks in the park.

57.     As they entered this section, Grisham and Airric separated from Watson. Grisham and Airric continued to walk and explore the festival, while Watson remained in the area close to the playground.

58.     As Grisham and Airric walked along the sidewalk, by vendor tents, they came up to a fork in the sidewalk and veered to the right. Strolling along on the windy pathway, Grisham passed out his literature and shared his faith with people. Some declined to accept Grisham's literature, but many took his hand-out as they walked past him.

59.     Grisham continued with expressive activity, walking and handing out tracts, for approximately 20 minutes, until they came to an intersection of sidewalks known as the "four-way," which appeared to be in the center of the Forest Fair and the park. At that location, Grisham stepped off sidewalk, onto a grassy area, so pedestrian traffic could easily pass, and proceeded to hand out literature to those who were walking by.

60.     While engaged in this expressive activity, Grisham did not impede traffic or access to any vendor or tent. The activity did not cause congestion because people kept walking after receiving the material from him.

61.     Grisham was not disrupting any of the Girdwood Forest Fair activities or interfering with anyone's enjoyment of it. He merely handed out written information to those who were willing to receive it.

62.     Notwithstanding, approximately 10 minutes later, at around 12:30 p.m., a Girdwood Forest Fair security guard came up to Grisham where he was standing.

63.     The security guard was wearing a bright red T-shirt bearing the words "SECURITY" in large white lettering on it.  Addressing Grisham directly, the security guard ordered him to stop handing out information about his religion, explaining that the Girdwood Forest Fair prohibits religious orders.

64.     Grisham reminded the security guard of his constitutional right to distribute literature in a public park during a public event. But the security guard was not swayed and warned Grisham to not hand out any materials.

65.     Grisham did not believe the festival rule could override the constitution.  He reiterated to the security guard his right to hand out literature.

66.     The security guard then got on his radio and informed the listener(s) that Grisham was refusing to leave and he needed help to deal with the situation.  He then told Grisham they were going to throw him out of the park and have him arrested.

67.     Grisham was stunned by the sudden turn of events.  He was trying to reason with the security guard to avoid a conflict.  But before Grisham could even respond to this news, a second security guard, also wearing a red shirt, arrived on the scene.

68.     The first security guard promptly grabbed Grisham by the arm and the second security guard grabbed Grisham by his other arm and they forcefully moved Grisham along, lifting him on his toes and causing to him to move in the direction guided by these guards.

69.     Grisham asked his grandson to follow behind them, as the two security guards physically forced Grisham to walk on the sidewalk, between some tents, and back through the

*Grisham v. City of Anchorage, et al.*

path between the brown house and children's playground, and then to the Girdwood Forest Fair security tent, which was just past the shuttle bus drop-off zone, and in front of Glacier City Hall, bordering Egloff Drive.

70.     After they came to the security tent, Grisham asked the guards to let him go, but they refused. The guards advised that they would hold him there until the police officer arrived. They persisted in holding his arms, keeping Grisham in that spot against his will.

71.     A few minutes later, a police officer arrived at the security tent.  The guards let Grisham go, and Grisham walked off with the police officer, Officer Casselman with the Whittier police department.  They walked for about 30 to 40 feet until they reached the edge of driveway off of Egloff Drive.

72.     At that point, they stopped walking and picked back up with the conversation. Officer Casselman reiterated the directives of the security guards.  He told Grisham that he had to leave the public park because he was distributing religious literature against the wishes of the event organizer.

73.     Around this same time, while Grisham was discussing the matter with Officer Casselman, Watson was encountering difficulties of her own.

74.     After handing out gospel tracts for approximately 15 minutes, Watson was also approached by a Girdwood Forest Fair security guard, a female, who similarly wore a red shirt with the words "SECURITY" on it.

75.     Referring to Watson's leafleting, the security guard told Watson that she could not conduct that activity in the park due to the rule of "no religious orders."  She instructed Watson to follow her to the security tent, and Watson obliged.

76.     The security guard led Watson on the same path that Watson took to get into the event, prompting her to walk by the playground on one side and the skate park on the other, and across the spot where shuttle buses were dropping off and picking up passengers.

77.     Watson tried to pass out gospel tracts and share with people as they were walking to the security tent, but the security guard did not let her do that, grabbing her arm at one point, cutting short conversations and forcing Watson to move along.

78.     Watson tried to assert her understanding of constitutional rights to the security guard, expounding that federal rules should trump any park rules, but to no avail.

79.     Soon, the two arrived at the security tent, which was signified by a painted board stating "Security."

80.     Arriving there, the female security guard escorting Watson asked two gentlemen who were sitting behind a table to explain to Watson why she could not hand out literature.  One of them, an individual wearing a red jacket, immediately stated:  "No dogs, no politics, no religious orders allowed in the Girdwood Forest Fair."

81.     Watson explained that federal rules trump this rule, but both gentlemen disagreed, saying "No, they don't."  The gentlemen in the red jacket added: "Okay, here's the thing.  You can follow the rules of the Forest Fair or you can leave. It's trespassing if you do not follow the rules.  We have the license to this park for the entire duration of the fair."

82.     Taking issue with this pronouncement, Watson reiterated that federal rules still control because the event occurs in a public park, with free admission, and thus, they are not free to discriminate against religion.  The gentleman answered:  "We absolutely can."

*Grisham v. City of Anchorage, et al.*

83.     Continuing on, the gentleman in the red jacket characterized religious discrimination as federal rules, as though federal law did not apply, and then asked Watson if she would like for him to call Officer Casselman.  To which, Watson, indicated that she would like to speak to a police officer about the situation.

84.     The gentleman then told Watson to go across the street to hand out literature and Watson declined.

85.     While waiting on the police officer to arrive, Watson walked a few yards back to the area where people were waiting for a shuttle bus, and handed out literature to those who wanted to see it.

86.     Less than one minute later, an organizer representative, the other gentleman who was sitting behind the table at the security tent, walked up to Watson and asked her to leave the park.

87.     Watson reminded that the event is public, but gentleman remarked:  "It is only public if you follow the rules."   He repeated the rule, stating: "No politics, no religion, no dogs…It is a rule that we have made, period."

88.     Watson responded that the park is public and that she would wait for the police officer to explain the constitutional rules to him.  But the organizer representative insisted: "In the meantime, I need you to step to the street and remove yourself from our property."

89.     Watson refused to leave the park.  She said she would stay there until a police officer removed her, claiming a right to be there.

90.     Watson then tried to pick back up with her leafleting, asking those in the vicinity if they would like literature representing freedom of religion.  The event representative

commented: "Nobody is saying you cannot practice. We're saying we are not allowing proselytization. No proselytization from anyone."

91. The representative emphasized the rule: "No religion, no politics, no dogs." He then addressed the people standing around them, speaking loudly about the parade, as way to interfere with and drown out Watson's speech.

92. Watson then tried to preach in effort to counteract what the representative was doing, but she was soon surrounded by many security guards asking her to stop.

93. After trying to reason with security guards for another minute or so, Watson looked up and noticed Grisham speaking with a police officer on the edge of the driveway. She walked over to join the conversation.

94. As Watson walked up, Grisham was informing the police officer of his constitutional right to speak and pass out literature in a public park during an event open to the public. Grisham was hoping the police officer would acknowledge his rights and let him exercise them.

95. But Officer Casselman did not acknowledge the relevance of constitutional rights. The officer said Girdwood Forest Fair event officials had a permit and they had a right to decide who could stay on the property.

96. Troubled by the stance, Grisham sought clarity from the police officer. He asked the police officer whether he was really forcing him to leave a public park due to his religious speech.

97. Officer Casselman confirmed the action, elaborating that the Girdwood Forest Fair had asked Grisham to leave. The officer also confirmed that Grisham would be arrested if he refused to leave the park area.

98. Grisham referred to his constitutional right to speak on public property again. Watson also asserted her constitutional rights. But the police officer was not moved by these pleas. The officer reminded Grisham and Watson that Girdwood Forest Fair has a rule banning religious orders and that they were violating the rule.

99. The police officer told Grisham and Watson that they would have to leave park property and go to a public sidewalk. He suggested a spot about 200 feet away from the entrance, on portion of sidewalk at the corner of Alyeska Highway and Egloff Drive.

100. Recognizing the impasse, and wanting to avoid arrest, Grisham and Watson agreed to leave and go to the sidewalk.

101. The three of them, Grisham, Watson and Airric, walked over to the public sidewalk where they were forced to go, located at the intersection of Alyeska Highway and Egloff Drive, outside of the confines of the park, to see if they could share their message there.

102. Both Grisham and Watson thought they could reach some people at the new location, but found the sidewalk vastly inferior to the park itself. From that spot, they could not reach any person who was using the shuttle bus to come to or leave the park. Though some were walking from the resort parking lot, a vast majority of the attendees used the shuttle bus to get to the park.

103.    Grisham and Watson tried to reach the few who were walking around them, but they quickly found the area was not well-suited for leafletting, since most of those in the area were not walking by them.

104.    In an effort to reach as many as they could from this location, Grisham preached in the open-air, while Watson stood nearby.  He tried to reach people in this way for about an hour and half, and hoped his message was heard, but having no real opportunity to engage with people, Grisham and Watson left.  They got in their car at the Alyeska Daylodge Resort, and drove back to Anchorage, frustrated by the constraints imposed on their speech.

105.    If not for Anchorage's policy and practice, giving the event organizer proprietary control over California Creek Park during the Girdwood Forest Fair, and enforcing a rule banishing "religious orders" under the threat of criminal arrest, Grisham and Watson would have continued distributing literature and having conversations about their faith in the park that day.

### Perpetual Impact on Grisham's and Watson's Religious Expression

106.    This continuing ban on religious expression is untenable for Grisham and Watson because they want to return to California Creek Park to share their religious beliefs at future Girdwood Forest Fairs.

107.    Hoping to resolve the dilemma, without having to initiate litigation, Grisham, through legal counsel, sent a letter dated August 24, 2017 to Anchorage Municipal Attorney, requesting relief from municipality policy and practice and the effective ban on religious expression at California Creek Park during the Girdwood Forest Fair.

108.    The letter described the events of July 8, 2017 and explained why the policy and ban violates constitutional rights.

109.     The letter also cited pertinent case law delineating the constitutional right to pass out literature and speak in a traditional public forum during the Girdwood Forest Fair, noting that the festival did not alter the nature of the public forum, rendering the ban on religious speech unconstitutional.  This letter asked for written assurance allowing Grisham and others to engage in desired religious expression during future Girdwood Forest Fairs.

110.     A couple of months later, on October 16, 2017, the Assistant Municipal Attorney of Anchorage responded to Grisham's letter.  This correspondence did not alleviate Grisham's concerns, but entrenched them.  While the author acknowledges general agreement on the underlying facts, Anchorage denies that California Creek Park is a public forum during the Girdwood Forest Fair.

111.     The author claimed the organizer has exclusive use of the park, though the event was free and open to the public, and that the permittee could rightfully single out and exclude religious expression from the public park.  This response confirmed Anchorage would continue to silence Grisham's – and by extension, Watson's – religious expression sought in California Creek Park at future Forest Fair events.

### Immediate and Enduring Irreparable Harm to Grisham and Watson

112.     The actions and statements of Anchorage demonstrate its intention to maintain a policy and practice that grants Girdwood Forest Fair, Inc. control over California Creek Park during a public event, enabling and empowering the organizer to exclude religious expression from the public park via police officers retained by Anchorage.

113.    The application and enforcement of this municipal policy and practice facilitates a content-based and a viewpoint-based restriction on Grisham's and Watson's religious expression in a traditional public forum.

114.    Grisham and Watson are both eager to return to California Creek Park in July of 2018 to share their beliefs at the 2018 Girdwood Forest Fair, but the fear of arrest chills and deters them from doing so.

115.    The fear of arrest severely restricts Grisham's and Watson's constitutionally-protected expression in California Creek Park during Girdwood Forest Fair in 2018 and beyond.

116.    The chill on Grisham's and Watson's exercise of their constitutional rights constitutes irreparable harm to them.

117.    There is no adequate remedy at law for the denial of Grisham's and Watson's constitutional rights.

## FIRST CAUSE OF ACTION

### Violation of Free Speech Clause

118.    Grisham's and Watson's religious expression is protected speech under the First Amendment and California Creek Park is a traditional public forum, including times when the Girdwood Forest Fair takes place.

119.    Defendants' policy and practice, and enforcement thereof, including, but not limited to giving a private entity a heckler's veto on public property and the resulting ban of religious expression in a traditional public forum:

        a.    are vague and overbroad;

        b.    single out religious speech for discriminatory treatment;

c.     discriminate against speech because of its religious content;

d.     discriminate against speech on the basis of the speaker's
        religious viewpoint;

e.     restrain constitutionally-protected speech in advance of its expression,
        without appropriate guidelines or standards to guide the discretion of
        officials charged with enforcing the policy;

f.     chill the free speech and free exercise of religion of Grisham, Watson, and
        third-party citizens not before the Court;

g.     permit the exercise of unbridled discretion;

h.     create a content-based heckler's veto that suppresses Grisham's and
        Watson's religious expression due to hostility toward the message;

i.     lack narrow tailoring, fail to achieve any legitimate government purpose,
        and fail to leave open alternative avenues for expression; and

j.     are patently unreasonable.

120.    Defendants have no legitimate reason that can justify their censorship of the
religious viewpoints that Grisham and Watson wish to express in a public park.

121.    Defendants' policy and practice, and the enforcement thereof, thus violate the
Free Speech Clause of the First Amendment to the United States Constitution, made applicable
to the States through the Fourteenth Amendment.

WHEREFORE, Grisham and Watson respectfully pray the Court grant the equitable and
legal relief set forth in the prayer for relief.

## SECOND CAUSE OF ACTION

20
*Grisham v. City of Anchorage, et al.*

**Violation of Due Process Clause**

122.    Defendants' policy and practice that adopt and enforce a ban on "religious orders" in California Creek Park during the Girdwood Forest Fair are vague and lack sufficient objective standards to curtail the discretion of officials and police officers.  As a result, the policy and practice adversely affect protected speech and are administered in an *ad hoc*, arbitrary, and discriminatory manner.

123.    Defendants have no legitimate reason that can justify their vague policy and practice.

124.    The policy and practice, and Defendants' enforcement thereof, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Grisham and Watson respectfully pray the Court grant the equitable and legal relief set forth hereinafter in the prayer for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Grisham and Watson respectfully pray for relief in that this Court:

A.      Assume jurisdiction over this action;

B.      Enter a judgment and decree declaring the actions taken by Defendants in prohibiting Grisham and Watson from sharing their religious viewpoints through literature distribution and conversation in California Creek Park during the 2017 Girdwood Forest Fair, an event open to the public, on July 8, 2017, violated Grisham's and Watson's constitutional rights, especially, their right to free speech and due process.

C.      Enter a judgment and decree declaring that Defendants' policy and practice empowering Girdwood Forest Fair, Inc. to retain proprietary control of California Creek Park

and employ a rule banning "religious orders" and effectively censoring religious expression in the park during the Girdwood Forest Fair is unconstitutional on its face and as applied to Grisham's and Watson's desired speech (literature distribution and conversation) because it violates Grisham's and Watson's rights as well as the rights of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

D. Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying policy and practice that gives proprietary control of a public park to a private entity during a public event, enabling and empowering the private entity to single out and eliminate religious expression in the park during the public event;

E. Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

F. That this Court award to each Plaintiff nominal damages arising from the acts of the Defendants as an important vindication of their constitutional rights;

G. That this Court award Plaintiffs their costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

H. Grant such other and further relief as appears to this Court to be equitable and just.

Respectfully submitted,

/s/Nathan W. Kellum                          /s/Anne R. Helzer
NATHAN W. KELLUM*                           ANNE R. HELZER
TN BAR #13482; MS BAR # 8813               ABA No. 0911054
Center for Religious Expression             Anne Helzer, Attorney at Law
699 Oakleaf Office Lane, Suite 107          310 K Street
Memphis, TN  38117                          Anchorage, AK 99501
(901) 684-5485 – Telephone                  (907) 264-6647 – Telephone
(901) 684-5499 – Fax                        (907) 264-6602 – Fax
nkellum@crelaw.org                          annehelzer@helzerlaw.com
*Motion for Participation by Non-eligible Attorney Pending
Attorneys for Plaintiffs David Grisham and Tina Watson

## <u>VERIFICATION OF COMPLAINT</u>

I, David Grisham, a citizen of the United States and a resident of _____,

Alaska, hereby declare that I have read the foregoing Verified Complaint and the factual

allegations therein, and the facts as alleged therein are true and correct.

_____
DAVID GRISHAM

**VERIFICATION OF COMPLAINT**

I, Tina Watson, a citizen of the United States and a resident of _Allen_ , Texas, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.

TINA WATSON