# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | |
|---|---|
| David Grisham and Tina Watson, | ) |
| Plaintiffs, | ) 3:18-CV-00001 JWS |
| vs. | ) ORDER AND OPINION |
| Municipality of Anchorage; John Rodda, in his official capacity as Anchorage Parks and Recreation Director; and John Casselman, individually, and in his official capacity as police officer for the Whittier Police Department, | ) [Re: Motion at docket 24] |
| Defendants. | ) |

## I. MOTION PRESENTED

At docket 24, with a memorandum in support at docket 25, Defendant John Casselman ("Defendant" or "Casselman") moves pursuant to Rule 12(b)(6) of Federal Rules of Civil Procedures to dismiss him from the case in both his individual and official capacity. Plaintiffs David Grisham ("Grisham") and Tina Watson ("Watson"; collectively "Plaintiffs") respond at docket 26. Defendant replies at docket 28-1. Oral argument was not requested and would not be of assistance to the court.

## II. BACKGROUND

Girdwood Forest Fair, Inc. ("GFF") is a non-profit organization that organizes the annual Girdwood Forest Fair (the "Fair"). The Fair is held at California Creek Park, a public park owned by the Municipality of Anchorage. GFF enters into a permit contract with the Municipality in order to use the park for the Fair, but the contract identifies the event as open to the public. The Fair lasts three days and includes performances by a variety of artists, children's activities, and the serving of food and libations. GFF maintains a rule for the Fair that is posted on the periphery of the park and on the fair's website: "No dogs, no politics, no religious orders."

Plaintiffs are Christians who want to share their religious beliefs with others in public. They attended the fair in 2017 with the intent to distribute religious literature and partake in conversations with willing participants. They noticed GFF's rule prohibiting dogs, politics, and religious orders posted on the periphery of the park grounds but did not believe it applied to them in a public setting. They began handing out religious materials to passersby. A fair security guard approached the Plaintiffs and told them to stop handing out literature, citing GFF's prohibition against religious orders. The guard informed Watson that if she continued to hand out religious materials she would have to leave because GFF had a permit to use the park for the event. Plaintiffs did not stop as directed, and fair security detained Plaintiffs and called local police.

Casselman arrived on the scene, dressed in full uniform. Casselman is a police officer with the Whittier Police Department. Whittier Police Department contracted with the Municipality of Anchorage in 2017 to provide four police officers to service Girdwood during the Fair. He escorted Plaintiffs to the edge of the park property and told them

they could not distribute religious material against the wishes of GFF, which had a permit to use the park. Casselman indicated that he would arrest Plaintiffs if they refused his direction, but suggested that they could continue their activities if they moved to the public sidewalk abutting the park. Plaintiffs complied and distributed material on the sidewalk for about 90 minutes before finding the location inferior for their purposes and decided to leave.

Plaintiffs then filed a complaint against the Municipality of Anchorage, the director of the Anchorage Parks and Recreation Department, and Casselman, in both his official and individual capacities. They assert that the defendants violated their First Amendment rights and their Fourteenth Amendment due process rights. Casselman seeks dismissal of the First Amendment claim against him in his individual capacity based on a qualified immunity, arguing he did not violate a clearly established right. He also seeks dismissal of the First Amendment claim against him in his official capacity based on redundancy, citing case law that holds that a lawsuit against an individual officer in his official capacity is redundant if a claim has also been raised against the policy-setting municipality.[1] Finally, he seeks dismissal of Plaintiffs' due process claim against him, arguing that a substantive due process claim is not available where a specific constitutional protection such as the First Amendment is implicated.[2]

Plaintiffs' opposition brief at docket 26 does not provide a response to Casselman's argument that their due process claim is subsumed into their First

---

[1]*Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

[2]*Albright v. Oliver*, 510 U.S. 266, 273 (1994).

-3-

Amendment claim and cannot be the basis for a separate cause of action, nor do they respond to his argument that their First Amendment claim brought against him in his official capacity is redundant given that the Municipality itself is a defendant in this case. Upon examination the court finds Casselman's arguments to have merit. This leaves only the issue of whether qualified immunity applies to protect Casselman from Plaintiffs' First Amendment claim against him individually.

### III.  STANDARD OF REVIEW

Qualified immunity can be asserted through a Rule 12(b)(6) motion.[3] In reviewing such a motion, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party."[4] To be assumed true, the allegations "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."[5] Dismissal for failure to state a claim can be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."[6] "Conclusory allegations of law . . . are insufficient to defeat a motion to dismiss."[7]

---

[3] *See Hydrick v. Hunter,* 500 F.3d 978, 985 (9th Cir. 2007) (deciding issue of qualified immunity asserted in Rule 12(b)(6) motion), *vacated and remanded on other grounds,* 556 U.S. 1256 (2009).

[4] *Vignolo v. Miller,* 120 F.3d 1075, 1077 (9th Cir. 1997).

[5] *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

[6] *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

[7] *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001).

## IV. DISCUSSION

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[8] "The doctrine is designed to balance 'two important, competing interests: the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes.'"[9] "[I]t protects 'all but the plainly incompetent or those who knowingly violate the law.'"[10]

When determining whether qualified immunity applies, courts apply a two-prong inquiry: (1) whether the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right; and (2) whether the right was clearly established at the time, such that a reasonable officer would have understood his conduct to be unlawful in that situation.[11] "Courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

---

[8]*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[9]*Easley v. City of Riverside*, No. 16-55941, 2018 WL 2273067, at *3 (9th Cir. May 18, 2018) (quoting *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir. 2017)).

[10]*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[11]*Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1051–52 (9th Cir. 2014).

particular case at hand.'"[12] "If the second prong is dispositive, courts need not analyze the first."[13]

The second prong consists of two separate determinations: "(1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law."[14] "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[15] To be clearly established does not require a case directly on point, but existing precedent must have placed the question "beyond debate."[16] Even if the violated right is in fact clearly established, it may be "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation [he] confronts."[17] If that is the case, the officer is still entitled to qualified immunity if his "mistake as to what the

---

[12]*Easley*, 2018 WL 2273067, at *3 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[13]*Id.*

[14]*Green*, 751 F.3d at 1052.

[15]*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks and alterations omitted).

[16]*Id.*

[17]*Saucier v. Katz*, 533 U.S. 194, 205 (2001), *abrogated in part on other grounds by Person v. Callahan*, 555 U.S. 223 (2009).

-6-

law requires is reasonable."[18]  Theses issues are ones of law, determined by the court in the absence of genuine issues of material fact.[19]

Casselman argues that he is entitled to qualified immunity because his conduct did not violate Plaintiffs' First Amendment rights and, alternatively, because any violation would not be clearly established under the applicable case law.  In support he cites *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*[20] for the proposition that Casselman acted appropriately in balancing GFF's First Amendment right to control the messages expressed at their permitted event with Plaintiffs' First Amendment right to distribute religious literature and proselytize.  In *Hurley*, the Supreme Court recognized that the First Amendment rights of a permit holder to use a public forum includes the right to exclude speech that conflicts with the permit holder's message.  The case involved the application of a Massachusetts public accommodation law to force parade organizers to allow a gay, lesbian, and bisexual group to march in the parade.  The court held that application of the public accommodation law in that context essentially forced the parade organizers to alter the expressive content of their parade and thereby violated the organizer's First Amendment rights.  In so holding, the Court explained that "[p]arades are . . . a form of expression" that are themselves entitled to protection under the First Amendment.[21]  It explained that the organizers had

---

[18]*Id.*

[19]*Green*, 751 F.3d at 1052.

[20]515 U.S. 557 (1995).

[21]*Id.* at 568.

a right to choose what to "leave unsaid" in their parade.[22] That is, the "general rule, that the speaker has a right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid . . . ."[23] Based on *Hurley*, Casselman argues that in removing Plaintiffs from the permitted area to the periphery, he was enforcing GFF's right to preserve the message expressly conveyed at the entrance to the Fair—the event is to be a place where discordant views on religion and politics are omitted—while at the same time providing for an alternative location for Plaintiffs' speech.

Plaintiffs argue that *Hurley* is inapplicable here because subsequent cases involving the free speech rights of members of the public attending privately sponsored, permitted events within public spaces have distinguished and limited the application of *Hurley*. They argue that *Gathright v. City of Portland*[24] and *Dietrich v. John Ascuaga's Nugget*,[25] make clear that *Hurley* applies only to limited situations— expressive events where the excluded speaker seeks to participate in that event. *Hurley*, they assert, does not apply to situations involving speakers who are merely present at a privately-sponsored public festival held in a public place pursuant to a permit and who cannot be construed as a participant in the event itself.

---

[22]*Id.* at 573.

[23]*Id.*

[24]439 F.3d 573 (9th Cir. 2006).

[25]548 F.3d 892 (9th Cir. 2008).

In *Gathright*, the plaintiff, a preacher, sued the City of Portland, alleging that his First Amendment rights were violated when police removed him from various privately sponsored, public events held in public parks based on an ordinance that prohibited a person from unreasonably interfering with a permittee's use of a public space. The Ninth Circuit, assuming with some reservation that the City had a significant interest in protecting the permittee's free speech,[26] held that the City's enforcement of the ordinance was not narrowly tailored to meet that interest.[27] It reasoned that "allowing permittees unfettered discretion to exclude private citizens on any (or no) basis is not narrowly tailed to the interest of protecting the permittees' rights under *Hurley*."[28] *Hurley*, it noted, involved a speaker that wanted to participate and be included in another speaker's expressive activity, whereas the speaker in *Gathright* was merely seeking to be present at a public event and engage in protected speech at that event. He did not want to be included in the event sponsor's speech, and there was no risk that his views could be associated with the event itself.[29]

*Dietrich* involved a similar situation. The plaintiff, a political volunteer, attended a privately-sponsored cook-off that was open to the public and held on public streets pursuant to a permit. She set up a table on a sidewalk within the boundaries of the

---

[26]*Gathright*, 439 F.3d at 577 n.3. The court stated without discussing that a privately-sponsored event held on public grounds pursuant to a city permit and open to the public constitutes a public forum and analyzed whether excluding those with views that are not of the sponsor's choosing was a valid time, place, and manner restriction. *Id.* at 577.

[27]*Id.* at 577.

[28]*Id.*

[29]*Id.* at 578.

-9-

permitted event to gather signatures for a public petition and to register voters. The sponsor of the event asked the plaintiff to leave and when she would not a police officer was called over and instructed her to move on threat of arrest. Again the court assumed without deciding that the officer's action was content neutral and that there was a significant government interest in protecting the free speech rights of the permit holder, but held that the removal of the plaintiff from the permitted area was not narrowly tailored to the stated goal of protecting the permittee's own First Amendment rights.[30] The court reasoned that, as was the case in *Gathright*, "there is little chance that the public would have viewed [the plaintiff's] petitioning activities as endorsed by the Cook-Off."[31]

Plaintiffs argue that protecting a permit-holder's right to control the message or exclude certain messages from an event is not a legitimate, content-neutral interest. Even if it were, under *Gathright* and *Dietrich*, Plaintiffs assert that removing peaceful members of the public engaged in protected speech at a privately-sponsored but public festival on public grounds based on the wishes of a permit-holder to exclude religious speakers is not narrowly-tailored to meet that interest. In response, Casselman asserts that this situation is distinguishable from the Ninth Circuit cases post-*Hurley* because Plaintiffs' exclusion was not just based on the whims of what GFF found unacceptable at that particular moment. Rather, the Fair is specifically intended to have an expressive collective message and that feature is made known to the public before

---

[30]548 F.3d at 899.

[31]*Id.*

-10-

entering—it is a festival designed to be free from controversy and a place of total neutrality. He argues that the collective message of the Fair was interfered with Plaintiffs began handing out religious literature and instigating religious discussions.

The court is inclined to find that *Gathright* and *Dietrich* bind the court's hands here and would require the court to find that the officer's exclusion of Plaintiffs violated their First Amendment rights. Indeed, the Ninth Circuit in *Dietrich* stated, "the [d]efendants' conduct resulting in a complete exclusion of [the plaintiff] . . ., for no reason other than the asserted right of the permittees to exclude anyone expressing a political message, violated the First Amendment."[32] However, as noted above, the court need not decide the issue of constitutionality if the second-prong is dispositive of the issue. Here, Casselman's argument only highlights the fact that the law in this area is far from clearly established. The fact that GFF had a stated policy to make the fair a content-neutral festival provides some distinction from the Ninth Circuit cases and makes *Hurley* at least arguably applicable here.

The court cannot conclude that "every reasonable official [in Casselman's place] would have understood that what he is doing violates [the Plaintiffs' First Amendment rights]."[33] Whether *Hurley* applies to a situation where a public event sponsor like GFF tries to establish a collective expressive message of neutrality within the permitted public space is not "beyond debate."[34] Even if Plaintiffs' rights in that situation were

---

[32]*Dietrich*, 548 F.3d at 899.

[33]*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks omitted).

[34]*Id.*

-11-

clearly established under *Gathright* and *Dietrich*, it would have been difficult for Casselman to determine how the relevant legal doctrine applied in this particular situation where the sponsor had posted its message of neutrality at the event's entrance.[35] That is to say, it was reasonable for him to believe that the Fair had an expressive message that was entitled to protection. Therefore, assuming that there was in fact a First Amendment violation, he is nonetheless entitled to qualified immunity.

## V. CONCLUSION

Based on the preceding discussion, Defendant Casselman's motion to dismiss Plaintiffs' complaint against him is GRANTED.

DATED this 13th day of June 2018.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT

---

[35] *Saucier,* 533 U.S. at 205.